IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>OSMAN ESCALANTE-LOPEZ,<br><br>Defendant. | ) | Case No. 5:26-CR-177 (AJB) |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

## I. INTRODUCTION

On May 14, 2026, the Defendant was arrested and charged by complaint for a violation of 8 U.S.C. § 1326(a) (Illegal Re-entry). *See* Dkt. 1. On May 28, 2026, the Defendant was charged by indictment for the same violation. Dkt. 9. The Defendant seeks to suppress evidence obtained from the interaction between himself and law enforcement occurring on May 15, 2026, as well as all evidence stemming from his arrest. Defendant's Motion to Suppress (hereinafter, the "Motion"), Dkt. 16, at 2. With respect to statements made by the Defendant at the Oswego Border Patrol Station, the Motion should be granted. With respect to all other evidence, the Motion should be denied.

The Defendant erroneously seeks to suppress evidence stemming from his arrest, including identifiers such as fingerprints, because he claims the interaction leading to his arrest was an unlawful seizure conducted without reasonable suspicion. *See* Motion, at 7-8. The Defendant ignores that Border Patrol Agents ("BPAs") engaged in a consensual encounter with the Defendant and other occupants of the Honda Civic (the "Civic") in which the Defendant was seated on the day of his arrest. The Civic and its occupants were only detained when the Civic's

back seat passengers admitted to BPAs they were in the United States illegally, thus justifying a seizure of the Civic based on reasonable suspicion of illegal activity. As such, BPAs interacted with, detained, and arrested the Defendant, and ultimately obtained evidence regarding his identity, in full compliance with the Fourth Amendment's requirements.

The Defendant next erroneously seeks to suppress his statements made to BPAs at the scene of the encounter, claiming they were the product of custodial, un-*Mirandized* interrogation. The Defendant overlooks that he was detained, not in custody, at the time those statements were given. As such, *Miranda* warnings were not necessary.

Finally, the Defendant seeks to suppress statements made to BPAs at the Oswego Border Patrol Station. The government agrees these statements should be suppressed, as the Defendant had previously arguably invoked his right to counsel and the Defendant did not affirmatively reinitiate communication with law enforcement prior to making the statements.

## II. FACTUAL BACKGROUND

On May 14, 2026, BPAs Edgar Lorenzo ("BPA Lorenzo"), Daniel Hutchings ("BPA Hutchings"), and James Wright ("BPA Wright") were investigating reports of the presence of undocumented aliens in Oneida, New York. *See* Dkt. 16-3 (I-213 narrative report), at 1; Dkt. 16-5 (BPA Lorenzo statement), at 1. BPA Lorenzo entered the Oneida Walmart to see if he would observe individuals engaged in suspicious activity. Dkt. 16-5, at 1. While in the Walmart, BPA Lorenzo observed a group of four Hispanic males shopping and speaking with South American accents. *Id*. Based on his training and experience, BPA Lorenzo was aware that "groups of undocumented individuals often shop together at the end of a workday or on weekends . . . . It is very common for groups of undocumented individuals to shop together, share homes, and drive together due to economic reasons." *Id*. BPA Lorenzo did not interact with the group within the

Walmart, but exited the building to alert BPA Hutchings and BPA Wright about his observations. *Id*.; Dkt. 16-4 (BPA Wright statement), at 1.

The three BPAs observed the four individuals exit the Walmart and get into a gray Honda Civic. Dkt. 16-3, at 1; Dkt. 16-4, at 1. The Civic crossed the street and parked in the parking lot of a nearby Tractor Supply Company store ("Tractor Supply"). *Id*. Four individuals exited the Civic and entered the Tractor Supply. Motion, Ex. C (Tractor Supply surveillance video), "20260514_0009_1529_102.m4v," from 11:29:04-11:29:33. The BPAs decided to conduct a consensual encounter with the individuals in the Civic. *See* Dkt. 16-3, at 1 ("Agents subsequently relocated to the parking lot to facilitate a potential *consensual encounter* with these individuals"); Dkt. 16-4, at 1 ("The three of us decided to *attempt* to talk to these individuals when they came back outside from the Tractor Supply"); Dkt. 16-5, at 1 ("We determined [Tractor Supply] would be an appropriate location to conduct a *consensual encounter*") (emphasis added). The BPAs waited for the individuals to exit the Tractor Supply before trying to speak with them. Dkt. 16-5, at 1.

The four individuals exited the Tractor Supply and re-approached the Civic. Dkt. 16-5, at 1; Motion, Ex. C, "20260514_0009_1357_110.m4v" (hereinafter "Video 110"), from 11:37:04-11:37:24. As the four individuals got back into the Civic, BPA Lorenzo drove up and parked his unmarked Border Patrol vehicle parallel to the Civic in the parking spot immediately to the Civic's left. Dkt. 16-5, at 1; Ex. C, Video 110, from 11:37:24-11:37:46. The three BPAs approached the Civic, with BPA Lorenzo and BPA Wright positioning themselves on the Civic's driver side, and BPA Hutchings positioning himself on the Civic's passenger side. Dkt. 16-4, at 1; Dkt. 16-5, at 1; Exhibit 1 (BPA Hutchings statement), at 1; Ex. C, Video 110, from 11:37:52-11:38:02. At the same time, an unrelated civilian approached the scene and placed an item in the

bed of his pickup truck, which was parked parallel to the Civic on the Civic's right side. Ex. C, Video 110, from 11:37:37-11:38:02.

Five individuals were in the Civic. Dkt. 16-5, at 1. The back seat passenger on the Civic's driver side had left the rear driver door open, and the passenger's leg was outside the vehicle. Dkt. 16-4, at 1. BPA Lorenzo knocked on the driver window, and the driver lowered the window. Dkt. 16-5, at 1. The three BPAs were in plain clothes, so BPA Lorenzo displayed his Border Patrol badge and identified the three as Border Patrol Agents. *Id*. BPA Lorenzo first spoke to the driver in Spanish and asked if the driver was a U.S. citizen. *Id*. The driver did not respond, so BPA Lorenzo next spoke to the back seat passengers in Spanish, asking them the same question. *Id*. at 1-2. The back seat passengers "responded that they were not United States citizens" and did not have legal status to be in the U.S. *Id*. at 2. BPA Lorenzo then asked the driver to place the vehicle in park and to turn off the ignition. *Id*. BPA Lorenzo again asked the driver about his immigration status, and the driver admitted he was not a citizen and had no legal status. *Id*. BPA Lorenzo asked the driver to exit the vehicle and placed the driver in handcuffs. Dkt. 16-4, at 1. As he did so, BPA Wright asked the driver side back passenger to fully close his car door. *Id*.

During this time period, BPA Hutchings was standing on the Civic's passenger side for "safety reasons" and to "maintain a better vantage point of the subjects on [the passenger side] of the vehicle." Ex. 1, at 1. BPA Hutchings noted the front passenger, later identified as the Defendant, "appeared nervous" and that the Defendant "kept moving around, repeatedly reaching down to the floorboards to grab his lunchbox/cooler and place it on his lap." *Id*. at 2. The Defendant also "reached with his left hand toward the pocket area of his pants multiple times." *Id*. Concerned that the Defendant might have a weapon in his pocket or lunchbox, BPA

Hutchings "instructed him multiple times to stop and place the lunchbox on the floor." *Id*. The Defendant complied after BPA Hutchings repeated his request multiple times. *Id*. By this time, BPA Lorenzo had detained and handcuffed the driver. *Id*. BPA Lorenzo now proceeded to the Civic's passenger side to speak to the Defendant. *Id*.; Dkt. 16-5, at 2; Ex. C, "20260514_0009_1541_114.mp4," from 11:41:16-11:41:32. BPA Lorenzo asked the Defendant about his legal status in the U.S., and the Defendant replied that he "was in the United States illegally." Dkt. 16-5, at 2. Each of the remaining individuals in the Civic, including the Defendant, were then arrested. *Id*. BPAs' encounter with the Civic's occupants, up to the point of the Defendant's arrest, occurred within the space of five minutes. *See* Ex. C.

The five aliens were transported to the Oswego Border Patrol Station, where they were identified via fingerprinting and Department of Homeland Security records. Dkt. 16-3, at 1; Dkt. 16-8. The Defendant was identified as a Guatemalan citizen who had been previously removed from the U.S. on two prior occasions. *See* Dkt. 1 (criminal complaint), at 3-4. At approximately 3:00 PM, BPAs provided the Defendant with his *Miranda* warnings in Spanish and asked if he understood them. *See generally* Dkt. 16, Exhibit F (video depicting Defendant's custodial interview). BPAs ultimately concluded that the Defendant "[d]id not understand" his rights; notated that the Defendant "wants lawyer" on a written *Miranda* form; and discontinued questioning. *Id*.; Dkt. 16-6. At approximately 8:00 PM that same day, different BPAs interviewed the Defendant and, according to a Border Patrol I-215B form documenting the interview, again administered *Miranda* warnings. Dkt. 16-7, at 1. This interview was not recorded. Ultimately, the Defendant answered BPAs' questions, making admissions regarding his Guatemalan citizenship and lack of legal status in the U.S. *Id*. at 1-2.

## III. ARGUMENT

The Defendant argues that all evidence obtained pursuant to his arrest should be suppressed because agents arrested him following an unlawful seizure; that his admission in the Tractor Supply parking lot that he was not a U.S. citizen and had no legal status in the U.S. was the product of un-*Mirandized* custodial interrogation; and that his statements to BPAs at the Oswego Border Patrol Station were likewise involuntary and given without a valid waiver of his constitutional rights. Motion, at 7-8, 13-14.

The Defendant overlooks that the BPAs' initial approach to the Civic constituted a consensual encounter, and not a detention. He further ignores that he was detained, not in custody, when he told BPA Lorenzo that he was not a U.S. citizen and had no legal status in the U.S. BPAs scrupulously complied with the Civic's occupants' constitutional rights during their approach and interactions at the Tractor Supply. Therefore, the evidence of the Defendant's identity and his statements made at the Tractor Supply parking lot should not be suppressed. However, the Defendant's statements to BPAs during his second custodial interview at the Oswego Border Patrol Station should be suppressed.

### A. The Defendant was Not Unconstitutionally Seized Because Agents Engaged in a Consensual Encounter with the Civic's Occupants

#### 1. Relevant Law

The Fourth Amendment does not proscribe all contact between law enforcement and citizens; instead, it is designed to prevent "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976). A law enforcement officer seizes an individual only when, "by means of physical force or show of authority, [the officer] has restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). But so long as a reasonable person would

feel free to disregard the officer and go about his business, the encounter is consensual and no Fourth Amendment seizure has occurred. *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

The Supreme Court has repeatedly held that a seizure does not occur simply because a law enforcement officer approaches an individual and asks questions. *See, e.g., I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). There is no requirement that an officer affirmatively advise a citizen that the citizen is free to leave or terminate the interview. *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996). "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Delgado*, 466 U.S. at 216 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 231-34 (1973)). Unless the circumstances of the encounter are intimidating to a degree that a reasonable person would have believed he was not free to leave if he had not responded, "one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Id*.

In determining whether a seizure has occurred, courts have assessed the impact of "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). An officer identifying himself as law enforcement does not convert a consensual encounter into a detention, nor does asking for a citizen's identification. *United States v. Montilla*, 928 F.2d 583, 589 (2d Cir. 1991). Courts have consistently held that questioning—absent a show of force, intimidating commands, or physical restraint by law enforcement—constitutes a consensual encounter and not detention. *See, e.g., Peterson*, 100 F.3d at 10 (during a consensual encounter, "officers may permissibly ask questions, such as why

the subject is at that location, and may make requests for identification and permission to inspect luggage"). Even clear law enforcement directives may not convert a consensual encounter into a detention. For example, in *United States v. Adegbite*, plain-clothes law enforcement waved a truck down, identified themselves, and asked the defendants for identification. *Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988). Because the agents did not employ "abundant displays of authority, including police uniforms, sirens and flashing lights, and signals to pull off the highway," the defendants were not subject to a Fourth Amendment seizure. *Id*. (citing *United States v. Castellanos*, 731 F.2d 979, 983-84 (D.C. Cir. 1984) (finding a consensual encounter where uniformed police officer approached defendant, seated in a parked car, and asked for identification)); *see also Michigan v. Chesternut*, 486 U.S. 567, 569, 574-75 (1988) (finding a consensual encounter where police car drove parallel to running defendant and asked questions; because record did not reflect police use of "siren or flashers; or that [police] commanded [defendant] to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block [defendant's] course or otherwise control the direction or speed of his movement," because conduct was not so intimidating that the defendant could reasonably believed he was not "free to disregard the police presence and go about his business"); *United States v. Springer*, 946 F.2d 1012, 1016-17 (2d Cir. 1991) (officer's request that defendant "step away from the taxi stand and the curb" did not elevate consensual encounter to detention where officer did not display a weapon, make a show of force, or physically touch the defendant).

These principles remain true in the immigration context. In *I.N.S. v. Delgado*, immigration agents obtained a warrant to enter a factory in search of illegal aliens. *Delgado*, 466 U.S. at 212. Agents were stationed near the buildings' exits, and other agents walked through the factory to question employees at their workstations. *Id*. The armed, uniformed agents

approached employees and asked one to three questions relating to the employees' citizenship. *Id*. Some of the employees challenged the constitutionality of the agents' actions, arguing they had been illegally seized based on the questioning and agents' positions at the factory doors. *Id*. at 213-14. The employees asserted that "the stationing of agents at the doors . . . meant that a reasonable worker would have believed that he was not free to leave." *Id*. at 214 (quotation omitted). The Supreme Court rejected these arguments, finding that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation." *Id*. at 216. Additionally, because the "purpose of the agents' presence at the factory doors was to insure that all persons in the factories were questioned," and not to prevent egress, no seizure occurred. *Id*. at 218-19. "[T]he mere possibility that [the employees] would be questioned if they sought to leave the buildings should not have resulted in any reasonable apprehension by any of them that they would be seized or detained in any meaningful way." *Id*. at 219.

Similarly, in *Pinto-Montoya v. Mukasey*, immigration agents approached two Guatemalan citizens as the Guatemalans disembarked from a plane. *Pinto-Montoya*, 540 F.3d 126, 127 (2d Cir. 2008). In response to the agents' questions, the Guatemalans admitted they were in the U.S. illegally. *Id*. at 127-28. The Guatemalans argued that the agents had illegally detained them and that their statements, and any evidence obtained pursuant to their ultimate arrests, should be suppressed. *Id*. at 126. The Second Circuit held that the encounter was consensual, as the Guatemalans had not been "physically restrained, ordered to stop, or otherwise coerced to answer questions when the agents approached them." *Id*. at 132. The Court also rejected the Guatemalans' claim that their freedom of movement was restricted because the agents were blocking the plane's exit ramp, finding that "stationing agents near the means of egress" cannot constitute "a seizure of all of the people on the other side of the exit." *Id*. (citing *Delgado*, 466

U.S. at 218). The Court noted that "[a]n immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away." *Id*. at 132-33 (quoting 8 C.F.R. § 287.8(b)(1)).

**2. BPAs Engaged in a Consensual Encounter with the Civic's Occupants**

In this case, the BPAs did not engage in the sort of "abundant display of authority" that would have elevated the encounter with the Civic's occupants to a Fourth Amendment seizure. *Adegbite*, 846 F.2d at 838. BPA Lorenzo used an ordinary rate of speed to park his unmarked Border Patrol vehicle parallel to the Civic. The BPAs approached the vehicle at a casual pace. No lights or sirens were on. BPAs did not display badges or point weapons at the Civic or its occupants. Indeed, BPA Lorenzo was the only BPA to display a badge and only did so to properly identify himself when addressing the Civic's occupants. No Border Patrol vehicle blocked the Civic from behind, and no BPA positioned himself behind the Civic to prevent it from leaving. The Civic's driver was free to drive away from the scene at any point during the encounter, until the moment when BPA Lorenzo heard the back seat passengers' admissions about the passengers' illegal immigration status. At that point, BPA Lorenzo developed reasonable suspicion to detain the Civic and its occupants. In fact, BPA Lorenzo permitted the driver to leave the Civic running until he developed sufficient reasonable suspicion to detain the back seat passengers and the vehicle they occupied. *See* Dkt. 16-5, at 2 (reflecting that BPA Lorenzo told the driver to "place the vehicle in park and turn off the ignition" only after the back seat passengers' admissions).

Furthermore, BPA Lorenzo did not issue any commands to the Civic's occupants. Instead, he asked simple questions of the driver about the driver's immigration status. When the Civic's driver did not respond to his questions, BPA Lorenzo did not order the driver to turn off

the vehicle or get out of the vehicle and did not repeat his questions in a more direct or threatening tone. Instead, BPA Lorenzo turned to the back passengers and asked them the same simple questions. BPAs permitted one of the back seat passengers to keep his door open, with his leg partially out of the vehicle, during the encounter. BPAs also permitted a third-party civilian to approach the scene, place an item in the civilian's truck directly next to where BPA Hutchings was standing, and drive away. BPAs' casual reaction to the civilian's approach would have further reinforced to the Civic's occupants that they were free to disregard law enforcement presence if they so chose.

Many courts have held that encounters of this nature are consensual. In *United States v. Ringold*, police observed a Chevrolet Blazer on a public road and followed the Blazer to a gas station, where the Blazer parked at a pump. *Ringold*, 335 F.3d 1168, 1170 (10th Cir. 2003). The police vehicle parked nearby, not blocking the Blazer's path of egress, and two armed, uniformed officers approached on foot. *Id*. at 1170-71. The locations where the officers stood "encircled" the defendant between them, the gas pump, and the Blazer. *Id*. at 1173. One officer engaged the defendant in conversation, first asking about the weather but later turning to potentially incriminating questions about illegal drugs and weapons. *Id*. at 1171. Ultimately the defendant consented to a search of the Blazer. *Id*. The Tenth Circuit Court of Appeals found that the interaction was consensual. *Id*. at 1174. Despite the officers "encircling" the defendant, "nothing prevented [the defendant] from simply entering his vehicle and driving away." *Id*. at 1173. And despite the potentially incriminating nature of the officer's questions, they "were not worded or delivered in such a manner as to indicate that compliance with any officer directives (or even inquiries) was required. Defendants do not dispute that the officers remained polite throughout the encounter, and . . . acknowledged that the officers did not display an intimidating

or coercive demeanor." *Id*. at 1174. Ultimately, the Court acknowledged the "natural tendency" of individuals to be "somewhat cowed when a law enforcement officer approaches and begins to ask questions," but found that "the law is too firmly established" to find other than a consensual encounter given the facts at hand. *Id*.

Similarly, in *United States v. Carr*, police parked a marked patrol unit near a stationary Tahoe SUV. *Carr*, 674 F.3d 570, 572 (6th Cir. 2012). Officers testified that there was enough room for the Tahoe to maneuver around the patrol car if it wanted to leave. *Id*. Officers briefly flicked the vehicle's police lights on and then off "to inform the passenger of the vehicle that they were police." *Id*. Two officers approached the Tahoe, one on its driver side and one on its passenger side and engaged the occupant in conversation. *Id*. at 572, 574. Neither drew his weapon. *Id*. at 572. Eventually, officers observed marijuana in plain view and detained the occupant. *Id*. The Sixth Circuit Court of Appeals rejected the occupant's argument that he had been detained and found that the officers' manner of approach was consensual. *Id*. at 573-74. Despite the presence of multiple officers on both sides of the Tahoe, "the officers did not engage in any coercive behavior that would make the encounter non-consensual" and "the officers testified that their entire encounter with [the defendant] was polite and friendly in tone. The encounter remained consensual because no indicator of coercion was present." *Id*. (citing *United States v. Dingess*, 411 F. App'x 853, 855-56 (6th Cir. 2011) (finding consensual encounter where two officers approached parked vehicle on foot on either side of vehicle)); *see also United States v. Pettis*, 591 F. App'x 393, 394-96 (6th Cir. 2014) (finding consensual encounter where officers approached parked car on foot, one on either side of vehicle, and asked passenger for identification); *United States v. Puga*, No. 5:19-CR-1346-1, 2019 WL 7170623, at *4 (S.D. Tex. Dec. 24, 2019) (unpublished) (officer was free to approach parked car, "try to talk to the

passengers, and even tap on the window to attract their attention"; encounter only escalated to detention when officer knocked "loud" and "hard" on the window and ordered occupants to open vehicle door).

**3. The Defendant and BPAs' Respective Positions Did Not Escalate the Consensual Encounter into a Fourth Amendment Seizure**

The Defendant argues that because he was a "passenger in a parked vehicle," of which "all doors were blocked by federal agents," he would not have felt free to leave. Motion, at 7. The Defendant overlooks the fact that the Defendant's position in the close quarters of the Civic's front passenger seat was not the result of any coercive law enforcement action, and therefore did not elevate the encounter to an illegal seizure.

As discussed above, the fact that officers approached the Civic on multiple sides does not elevate the consensual encounter to a detention. *See, e.g., Carr*, 674 F.3d 572-74. While the Defendant complains that "[t]he car could not have moved without at least its mirrors striking federal agents," *see id*. at 8, the BPAs' approach and positions outside the vehicle during the encounter was the natural avenue for anyone, law enforcement or not, to converse with someone seated inside a vehicle. BPAs were careful not to position any agent behind the Civic, to ensure it could disengage and leave if desired.

Additionally, the Defendant's argument is similar to one expressly rejected by the Supreme Court in *Florida v. Bostick*, 501 U.S. at 435-37. In *Bostick*, two armed and uniformed officers boarded a bus and questioned the defendant, asking to inspect his ticket and identification. *Id*. at 431. After the defendant provided valid identification, officers continued to question him about illegal drugs and asked for the defendant's consent to search his luggage. *Id*. at 431-32. Ultimately, the officers searched the luggage and found narcotics. *Id*. at 432. The defendant argued that the encounter could not have been consensual because "it took place in the

cramped confines of a bus" where a police encounter is "much more intimidating" because "police tower over a seated passenger and there is little room to move around." *Id*. at 435. He asserted that a reasonable passenger would not have felt free to leave because "there is nowhere to go on a bus" and because "the bus was about to depart" and if the defendant had left, he would have been "stranded." *Id*.

The Supreme Court disagreed, stating that "the mere fact that [the defendant] did not feel free to leave the bus does not mean that the police seized him." *Bostick*, 501 U.S. at 436. The Court acknowledged that the defendant's movements were "'confined' in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive." *Id*. The Court, recalling its decision in *I.N.S. v. Delgado*, held that because the defendant's movement was restricted by a factor independent of police conduct, his reliance on the question of whether a reasonable person would have felt "free to leave" was inapplicable. *Id*. Rather, "[i]n such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id*. "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id*. at 437 (citing *Chesternut*, 486 U.S. at 569).

The Second Circuit applied these same principles in *United States v. Madison*, 936 F.2d 90 (2d Cir. 1991). In *Madison*, police noticed the defendant acting nervous at a bus stop. *Id*. at 91. After the defendant boarded the bus, a plain-clothes detective walked up to the defendant, identified himself by displaying a badge, sat down in the seat behind the defendant, and began asking the defendant questions. *Id*. at 91-92. Another plain-clothes detective stood a few rows

in front of the defendant, partially in the aisle. *Id*. at 91. Ultimately the defendant was arrested for possessing narcotics. *Id*. at 92. The defendant argued that the drugs' discovery was a result of an illegal seizure, and the district court agreed, apparently troubled that the "confined environment of the encounter" could have "intimidated" the defendant and compelled him to respond to the detective's questions. *Id*. at 92, 93-94. The Second Circuit reversed, reminding that the defendant was only seized if he "could reasonably have believed that if he attempted to get off the bus, he would have been prevented from doing so" by the detectives. *Id*. at 94. Because "the confined environment was not the result of the officers' actions," the district court erred in finding a Fourth Amendment violation based on the location where the questioning occurred. *Id*. Because the defendant intended to ride the bus, not exit it, if he did not wish to engage with the detectives, he "could have simply refused to answer the officer's questions and continued sitting on the bus in silence, waiting for it to depart." *Id*. at 95. If the officer had then escalated the encounter by threatening to detain the defendant or by preventing the bus from leaving, that might have constituted a Fourth Amendment seizure. *Id*. "There is no evidence, however, that [the detective] exerted, or even implied, any of these pressures." *Id*.

This case is similar to *Bostick* and *Madison* in that the Defendant, independent of any law enforcement action, chose to enter the Civic's passenger seat with the apparent expectation that the Civic's driver would transport him to their next destination. Thus, the test is not whether the Defendant would have felt "free to leave" the passenger seat when BPAs approached, but whether he would have felt free to refuse to engage with their questions. *See Bostick*, 501 U.S. at 436. And in fact, no BPA questioned the Defendant until after the passengers provided incriminating information and the driver was detained, at which point the vehicle and its occupants were not free to leave. Similarly, the Civic's other occupants would have felt free to

refuse to engage with BPAs; indeed, the driver did just that by declining to answer BPA Lorenzo's questions about immigration status. The Civic's occupants all observed the driver suffering no adverse consequences for refusing to engage with BPA Lorenzo's questions. As such, the fact that the Defendant was seated in the Civic while BPAs were outside the car did not escalate the encounter to a seizure. The Defendant's demand that evidence stemming from this encounter be suppressed should be denied.

**B. The Defendant's Incriminating Statements at Tractor Supply were Not the Product of Custodial Interrogation**

The Defendant also argues that his incriminating statements to BPA Lorenzo in the Tractor Supply parking lot should be suppressed because at the time he made the statements, he was "in custody and interrogated" by BPAs without having first been provided *Miranda* warnings. Motion, at 13-14. The Defendant ignores that when BPA Lorenzo arrested the Civic's driver, the Civic and its other occupants became detained, not arrested. BPA Lorenzo then proceeded to question the Defendant, but this questioning was noncustodial and therefore admissible.

**1. Relevant Law**

During a vehicle stop or scenario where an occupant of a vehicle has been arrested, the vehicle's other occupants are detained. *See Arizona v. Johnson*, 555 U.S. 323, 333-34 (2009); *Brendlin v. California*, 551 U.S. 249, 256-58 (2007) ("[A] sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing"). Law enforcement can order occupants of a detained vehicle to exit the vehicle as a precautionary measure, without separate reasonable suspicion that the passenger poses a safety risk. *See id*. at 258; *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997). Additionally, assuming a lawful detention, questioning a detainee does not

require reasonable suspicion independent of the basis for detention. *See, e.g., Muehler v. Mena*, 544 U.S. 93, 100-101 (2005) (agents did not need "independent reasonable suspicion" in order to question defendant about her immigration status while she was detained during an unrelated search warrant execution); *United States v. Quintanilla*, No. CRIM. 3:2006-17, 2006 WL 3392439, at *6 (W.D. Penn. Nov. 22, 2006) (unpublished) ("The questioning of a lawfully detained individual (including questioning regarding a detainee's immigration status) that does not prolong the detention does not equate to an illegal seizure under the Fourth Amendment and thus, such questioning itself need not be based upon an reasonable suspicion").

The Supreme Court has held that an individual must be advised of his Fifth Amendment rights against self-incrimination before any statements "made during custodial interrogation could be admitted in evidence." *Dickerson v. United States*, 530 U.S. 428, 431-32 (2000). A suspect is entitled to *Miranda* warnings only if he or she is interrogated while "in custody." *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998). In determining whether an individual is in custody, courts examine all the circumstances surrounding the interrogation, with the ultimate inquiry being "whether there was a formal arrest or restraint on freedom of movement to the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). The analysis is objective: "whether a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (cleaned up, quotations omitted). Courts should consider various factors, including the interrogation's duration; its location; whether the suspect volunteered for the interview; whether the officers used restraints or displayed weapons; and whether officers told the suspect he was free to leave or under suspicion. *United States v. Schaffer*, 851 F.3d 166, 174 (2d Cir. 2017).

Courts have frequently found non-custodial interrogation even in circumstances where it was apparent police suspected that the individual being questioned had committed a crime. For example, in *Cruz v. Miller*, police were investigating a recent shooting and encountered the defendant, who resembled the shooter's description. *Cruz*, 255 F.3d 77, 78 (2d Cir. 2001). Police detained the defendant at gunpoint, but after finding no weapon on him after a frisk, holstered their guns and questioned him. *Id*. One officer primarily questioned the defendant, but several others were in the immediate vicinity. *Id*. During the interview, the defendant heard officers radio for an eyewitness to come and identify the defendant. *Id*. at 86. The Second Circuit held that the interview was noncustodial. *Id*. at 86-87. It pointed out that the questioning occurred on a public street; that the questioning was brief and "of the sort that could reasonably be thought not to make the suspect feel that he was about to be held for a prolonged period of time"; and that the defendant was not handcuffed. *Id*. at 86. The Court found that the officers' initial show of force and presence in large numbers was justifiable given officer safety concerns. *Id*. And while the officers' clear suspicions may have made the defendant "apprehensive," as a whole, the police conduct was "well within the Supreme Court's scope of permissible *Terry*-stop action confirming or dispelling the officer's suspicions." *Id*. (quoting *Berkemer*, 468 U.S. at 439); *see also United States v. Simmonds*, 641 F. App'x 99, 101-103 (2d Cir. 2016) (finding an interview noncustodial despite agents' initial display of firearms and questions that included accusing defendant of lying and confronting him with evidence of his guilt).

These principles have also been upheld in the context of passengers in vehicle stop situations. In *United States v. Stambler*, officers conducted a vehicle stop on a public road after observing the vehicle's occupants engaged in suspicious activity. *Stambler*, 629 F. App'x 104, 108 (2d Cir. 2015). Two officers approached the vehicle from behind and separated the two

occupants to question them. *Id*. at 109. The officer questioning the defendant did not handcuff the defendant or order him out of the car, although the defendant did observe that his passenger was placed under arrest. *Id*. The Second Circuit concluded that "[b]ecause there was no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest, we conclude that a reasonable person in [the defendant's] shoes would not have felt that he or she was not at liberty to terminate the interrogation and leave." *Id*. (quoting *Stansbury*, 511 U.S. at 322) (other citations omitted). Courts in other jurisdictions have reached similar conclusions. *See United States v. Teemer*, 394 F.3d 59, 65-66 (1st Cir. 2005) (finding interview noncustodial where defendant, a vehicle passenger during a traffic stop, was asked to step out of the vehicle and questioned for approximately 30 minutes with multiple officers in the vicinity); *United States v. Ramirez-Cubillas*, 233 F. Supp. 2d 1049, 1052-53, 1056-57 (D. Neb. 2002) (finding interview noncustodial where defendant, a driver during a traffic stop, was questioned about immigration status while seated in a police vehicle); *United States v. Fortson*, 688 F. Supp. 2d 12, 14-15 (D. Me. 2010) (finding interview noncustodial where defendant, a vehicle passenger during a traffic stop, was asked to step out of the vehicle and was questioned about whether drugs were in the vehicle).

**2. The Defendant Was Detained as a Passenger in a Seized Vehicle, But BPA Lorenzo's Brief Questions of the Defendant Were Noncustodial**

As discussed above, BPAs' encounter with the Civic and its occupants was entirely consensual until BPA Lorenzo developed reasonable suspicion to detain the Civic and its occupants following the back seat passengers' admissions about their illegal immigration status. At that point, BPA Lorenzo for the first time directed the driver to "place the vehicle in park and turn off the ignition," and following admissions from the driver, placed the driver in handcuffs. Dkt. 16-5, at 2. Based on BPA Lorenzo's directives and placing the driver in handcuffs, the

Civic and its occupants had been lawfully seized within the meaning of the Fourth Amendment.

However, seizure does not necessarily mean *Miranda* warnings must be administered, and in this case, they were not required to question the Defendant because he was not yet in custody. The question is whether a "reasonable person" in the Defendant's position would have believed himself to be "subjected to restraints comparable to those associated with a formal arrest." *FNU LNU*, 653 F.3d at 153. At the time the Defendant was questioned by BPA Lorenzo, he was still seated in the Civic's passenger seat, situated in a public place in a location he chose to enter. While BPA Hutchings had directed the Defendant to place his lunchbox on the floor, no BPA had ordered the Defendant to exit the vehicle. BPAs had casually approached the vehicle; were in plain clothes; and were not operating vehicles equipped with lights or sirens. The Defendant had observed the Civic's driver refuse to engage with BPA Lorenzo's questions without adverse consequences. While the Defendant had observed the Civic's driver be arrested after the driver admitted he was in the U.S. illegally, the Defendant had also observed the back seat passengers make the same admissions without BPAs taking steps to take them into custody. The Defendant was not in handcuffs. While BPAs' actions may have made the Defendant "apprehensive," as a whole, BPAs' conduct was "well within the Supreme Court's scope of permissible *Terry*-stop action" by questioning the Defendant to confirm or dispel their suspicions that the Defendant, like the Civic's other occupants, was present in the U.S. illegally. *See Cruz*, 255 F.3d at 86. Nothing the BPAs had said or done at the time of the Defendant's questioning would have caused a reasonable person to believe he was under arrest.

The circumstances of the Defendant's questioning are significantly less suggestive and coercive than other scenarios where courts have found noncustodial interrogation. In *United States v. Pence*, fourteen agents armed with various weapons and breaching equipment executed

a search warrant at the defendant's residence. *Pence*, 172 F.4th 213, 215-16 (2d Cir. 2026). During the warrant execution, the defendant was asked to enter an FBI vehicle, along with two FBI agents. *Id*. at 216. The agents proceeded to speak with the defendant for over two hours, of which an hour and a half was "rapport-building or small talk" and the remainder involved the agents confronting the defendant with evidence and obtaining details of the defendant's criminal behavior. *Id*. The defendant argued that the interview was custodial, because he was in an FBI vehicle, "outnumbered two to one," and because the agents "confronted him with evidence of his guilt." *Id*. at 219. The Second Circuit indicated the case presented a "close call," but ultimately found the interrogation noncustodial. *Id*. at 220. Because the agents were non-threatening; the defendant was not handcuffed; and the defendant agreed to speak with agents and never asked to discontinue the interview, the Court held that a "reasonable person" would not have believed "he was at the mercy of the agents, or that his freedom was curtailed to a degree akin to formal arrest." *Id*. Here, BPA Lorenzo's quick two-to-three question dialogue with the Defendant is in stark contrast to the multi-hour interview the Second Circuit nevertheless approved as noncustodial in *Pence*. *See also United States v. Roncone*, 824 F. Supp. 3d 311, 322 (W.D.N.Y. 2026) (finding 20-minute interview, conducted between uncuffed defendant and two agents inside police vehicle, was noncustodial). As a result, the Defendant's demand that evidence of his statements to BPA Lorenzo at the Tractor Supply be suppressed should be denied.

**C. The Defendant's Statements at the Border Patrol Station Should Be Suppressed**

After an accused has invoked his right to counsel, law enforcement officials must cease their interrogation until counsel has been provided, unless the accused reinitiates further communication with law enforcement. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). In this case, interviewing BPAs wrote that the Defendant "wants lawyer" on a written *Miranda*

form, indicating it was sufficiently clear to BPAs that the Defendant had invoked his right to counsel. *See* Dkt. 16-6. Nevertheless, a few hours later, BPAs once again provided the Defendant with *Miranda* warnings and interviewed him. *See* Dkt. 16-7. The Defendant did not affirmatively reinitiate communication with law enforcement following his apparent invocation of his right to counsel. Therefore, the government agrees that the Defendant's statements to BPAs at the Oswego Border Patrol Station should be suppressed.

## IV. CONCLUSION

BPAs engaged in a consensual encounter with the Civic and its occupants, including the Defendant. When the back passengers admitted they were in the U.S. illegally, BPAs had sufficient information to detain the Civic and its occupants. The Defendant continued to be detained, not arrested, when BPA Lorenzo asked him whether he was a U.S. citizen or had legal status in the U.S. When the Defendant replied in the negative, BPAs had probable cause to arrest him. As such, evidence of the Defendant's identity was not the product of an unconstitutional seizure, and no evidence stemming from his arrest should be suppressed. Likewise, the Defendant's statements made at the Tractor Supply were not the product of custodial interrogation and should not be suppressed. The government agrees that statements made by the Defendant at the Oswego Border Patrol Station should be suppressed.

For the foregoing reasons, the Defendant's motion should be denied in part and granted in part.

Respectfully submitted,

TODD BLANCHE
Acting Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney

By: ______________________________
Benjamin A. Gillis
Assistant United States Attorney
Bar Roll No. 704915