**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

-v-

5:26-CR-177 (AJB)

OSMAN AROLDO ESCALANTE-LOPEZ,

Defendant.

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION and ORDER**

## I. INTRODUCTION

On May 14, 2026, border patrol agents arrested defendant Osman Escalante-Lopez ("defendant") in a store parking lot in Oneida, New York. Dkt. No. 1. The agents charged defendant with illegal reentry in violation of 8 U.S.C. § 1326(a). *Id.* Thereafter, a grand jury indicted defendant on the same charge on May 28, 2026. Dkt. No. 11. Defendant has moved to suppress certain statements and evidence obtained by agents before and after his arrest. Dkt. No. 16. The Government has opposed defendant's motion in part. Dkt. No. 19. The Court heard argument from the parties on defendant's motion on August 20, 2026. *See* Case No. 1:25-CR-177, Dkt., Minute Entry (Aug. 20, 2026).

Upon review of the papers and after hearing argument, the Court finds that no evidentiary hearing is warranted and that, for the reasons explained *infra*, the border patrol agents violated defendant's Fourth Amendment rights by initiating an investigatory stop without reasonable suspicion. In light of this finding and based on representations by counsel that were made at oral argument, the Court directs the parties to submit supplemental briefing on the appropriate remedy.

## II. FACTUAL BACKGROUND[1]

On May 14, 2026, three border patrol agents were conducting plainclothes surveillance operations in the Oneida, New York, area "in response to multiple reports indicating that local farms and ranches were employing people without legal authorization to work in the United States." Dkt. No. 16-3 at 1. Traveling in two unmarked vehicles, the agents stopped at the Oneida Walmart so that Senior Border Patrol Agent Edgar Lorenzo ("SBPA Lorenzo") could use the restroom. *See* Dkt. No. 16-4 at 1; Dkt. No. 16-5 at 1; Dkt. No. 19-1 at 1.

Before using the restroom, SBPA Lorenzo walked around the store to look for suspicious activity in light of "the high population of undocumented [noncitizens] and prior arrests in the Oneida area."[2] Dkt. No. 16-5 at 1. While in the toy section, SBPA Lorenzo "overheard several individuals speaking Spanish with accents that [he] recognized as South American . . . based on [his] over 19 years of experience with the United States Border Patrol and [his] own Hispanic background." *Id.*; Dkt. 19-1 at 1. According to SBPA Lorenzo, "it is very common for groups of undocumented [noncitizens] to shop together, share homes, and drive together due to economic reasons." Dkt. No. 16-5 at 1.

SBPA Lorenzo informed the other border patrol agents, Dan Hutchings ("BPA Hutchings") and James Wright ("BPA Wright"), of his observations and proposed that the agents "conduct a

---

[1] The following facts are derived from the parties' evidentiary submissions, including, *inter alia*, the border patrol agents' signed statements concerning defendant's arrest, *see* Dkt. Nos. 16-4, 16-5, 19-1; and defendant's fingerprint and DHS records, *see* Dkt. No. 16-3, 16-8. As the court has noted and for reasons that will be made clear in the analysis, no evidentiary hearing is necessary. *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (explaining that no evidentiary hearing is warranted on a motion to suppress based on an illegal seizure unless the papers have raised contested issues of fact going to the validity of the seizure).

[2] As defendant points out, there is no indication in the record that the "multiple reports" specified the identities of the farmworkers, "what clothes they wore, what they looked like," where they worked or lived, "what their country of origin was, . . . what vehicles they traveled in, what type of farms they worked on, what language they spoke, how many were traveling together, what gender they were, how old they were, what stores they frequented." Dkt. No. 16-1 at 2.

consensual encounter" once the men left Walmart. Dkt. No. 16-5 at 1. The agents monitored the exits from their vehicles and, an hour and a half later, the men exited the store. *Id.*; Dkt. No. 16-4 at 1; Dkt. No. 19-1 at 1. SBPA Lorenzo observed the men getting into a gray sedan. Dkt. No. 16-5 at 1; Dkt. No. 16-3 at 1; Dkt. No. 16-4 at 1. "Due to the congested parking lot and the brief time it took for [the men] to enter their vehicle, [the agents] decided to follow them to their next destination." Dkt. No. 16-5 at 1.

The men traveled across the street to the Tractor Supply Company store ("Tractor Supply"). Dkt. No. 16-3 at 1. SBPA Lorenzo "followed the [sedan] in his unmarked [border patrol] vehicle as it drove out of the parking lot." Dkt. No. 16-4 at 1. The other agents followed SBPA Lorenzo's vehicle at a distance. Dkt. No. 16-4 at 1. Around this time, SBPA Lorenzo observed five individuals in the sedan. Dkt. No. 16-5 at 1. The driver of the sedan parked the vehicle in the Tractor Supply parking lot in a spot that faced the road:



Dkt. No. 16-2, Ex. E (folder 5426tsc, file name 20260514_0009_1528_101) at 11:28:24–11:28:27. There was a curb to the front of the sedan, and a pickup truck in the spot immediately to the right of the sedan. *Id.*

"All of the individuals, except the driver entered the [s]tore." Dkt. No. 16-5 at 1. "Shortly thereafter, [the] four individuals exited the store and returned to the vehicle." *Id.* At this point, the agents had determined that the Tractor Supply parking lot would be a suitable location to initiate a consensual encounter. *Id.*

Once the four men had re-entered the gray sedan, SBPA Lorenzo parked his black, unmarked border patrol vehicle directly to the left of the sedan:



Dkt. No. 16-2, Ex. E (folder 5426tsc, file name 20260514_0009_1537_110) at 11:37:46; *see also* Dkt. No. 16-5 at 1; Dkt. No. 19-1 at 1. The other agents parked "approximately 20–30 yards away and started to walk towards the individuals" as they walked toward the sedan. Dkt. No. 16-4 at 1.

SBPA Lorenzo promptly exited his vehicle, knocked on the driver's window, and identified himself as a border patrol agent by displaying his badge. Dkt. No. 16-5 at 1. Meanwhile, the two other agents exited their vehicle and approached the sedan. Dkt. No. 16-4 at 1. BPA Hutchings positioned himself immediately outside the front passenger-side door, where defendant was seated, and BPA Wright stood next to the rear driver's side door. *Id.*

Then, SBPA Lorenzo began questioning the occupants of the sedan, first asking the driver if he was a United States citizen. Dkt. No. 16-5 at 1. During this time, BPA Hutchings observed defendant reaching toward the floor, seemingly in an attempt to pick up his lunchbox and place it on his lap. Dkt. No. 19-1 at 2. BPA Hutchings further observed that defendant appeared nervous, and that defendant's left hand was near "the pocket area" of his pants. *Id.* Upon making these observations, BPA Hutchings ordered defendant "to stop and to place the lunchbox on the floor" multiple times. *Id.* According to BPA Hutchings, he issued the command until defendant complied. *Id.*

Meanwhile, the driver of the sedan showed reluctance to respond to SBPA Lorenzo's questioning. Dkt. No. 16-5 at 1–2. Instead of discontinuing the encounter or pushing for a response from the driver, SBPA Lorenzo began to direct his questioning at the back seat passengers. *Id.* at 1–2. He asked the back seat passengers, in Spanish, if they were United States citizens, and they responded that they were not. *Id.* at 1–2. SBPA Lorenzo further inquired whether the back seat passengers had lawful status to be in the United States, and they indicated that they did not. *Id.*

Upon the backseat passengers' admissions, SBPA Lorenzo instructed the driver to turn off the vehicle and, again, asked the driver about his immigration status. Dkt. No. 16-5 at 2. The driver finally responded that he, too, lacked legal status to be in the United States, and SBPA Lorenzo placed the driver under arrest. *Id.*

After SBPA Lorenzo had secured the driver in his vehicle, he proceeded to the passenger's side of the sedan and asked defendant about his legal status. Dkt. No. 16-5 at 2; Dkt. No. 19-1 at 2. Defendant stated that "he was in the United States illegally." Dkt. No. 16-5 at 2. SBPA Lorenzo advised the other agents of defendant's response, and the agents decided to arrest all of the

individuals in the sedan. *Id.* Each individual "was removed from the vehicle individually, searched, and placed in handcuffs." *Id.*

The agents transported the men to a border patrol station in Oswego, New York, for further processing. Dkt. No. 16-5 at 2; Dkt. No. 19-1 at 2. At the border patrol station, defendant and the other individuals were fingerprinted. *See* Dkt. No. 16-8. Agents at the border patrol station made a record of defendant's arrest and incorporated the record into his existing file with the Department of Homeland Security (the "A-file"). *See* Dkt. No. 16-3.

At some point, defendant was taken to a room for questioning. A border patrol agent read defendant his *Miranda* rights from a "Spanish-language paper," and defendant repeatedly indicated that he did not understand. *See* Dkt. No. 16-1 at 4 (citing Dkt. No. 16-6). Questioning continued for a period, but eventually, an agent documented that defendant did not understand his rights and that he wanted a lawyer. Dkt. No. 16-6.

Hours later, two border patrol agents again interrogated defendant. They "timestamped an English-language document claiming to be an affidavit indicating that Mr. Escalante-Lopez understood his Miranda warnings and his rights to counsel, allegedly waived them, and made [incriminating] statements." Dkt. No. 16-1 at 5 (citing Dkt. No. 16-7). The agents claimed that defendant admitted to re-entering the United States without permission after he had previously been deported from the United States. Dkt. No. 16-7 at 1–2.

## III. LEGAL STANDARD

A defendant may move pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure for the suppression of evidence. Fed. R. Crim. P. 12(b)(3)(C); *see also* Fed. R. Crim. P. 41(h). "It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (citation

omitted). "Once the movant establishes some basis for the suppression motion, for example a search or seizure conducted without a warrant, the burden of proof shifts to the Government." *United States v. Murphy*, 778 F. Supp. 2d 237, 240 (N.D.N.Y. 2011) (citing *Arboleda*, 633 F.2d at 989), *aff'd*, 703 F.3d 182 (2d Cir. 2012). To defeat the defendant's motion, the Government must "demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment." *Id.* (citation omitted).

## IV. DISCUSSION

Defendant argues that statements he made prior to his arrest, statements he made at the border patrol station after his arrest, and fingerprint and A-file records generated at the border patrol station were obtained in violation of his Fourth and Fifth Amendment rights and must be suppressed. *See* Dkt. No. 16-1 ("Def's Mem."). The Government concedes that statements defendant made at the border patrol station after he had invoked his right to counsel were obtained in violation of defendant's Fifth Amendment rights and should be suppressed, but the Government opposes the suppression of all other evidence.[3] Dkt. No. 19 ("Gov't Opp.").

### A. Fourth Amendment

Defendant argues that the border patrol agents violated the Fourth Amendment by detaining him and the other occupants of the sedan in the Tractor Supply parking lot without reasonable suspicion that they had committed a crime. Def.'s Mem. at 7–10. In opposition, the Government

---

[3] The Government concedes that border patrol agents violated defendant's Fifth Amendment rights by re-initiating their custodial interrogation of defendant after he had invoked his right to counsel without first affording him an opportunity to consult with an attorney. *See* Gov't Opp. at 1–2; *see also Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) ("[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."). Accordingly, any statements made by defendant after he invoked his right to counsel will be suppressed. *See Arizona v. Roberson*, 486 U.S. 675, 681–82 (1988) (affirming suppression of statements obtained in violation of rule set forth in *Edwards*).

contends that the interaction between the agents and the men was a consensual encounter, for which no suspicion was required. Gov't Opp. at 6–16.

Ordinarily, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Voluntary interactions of this sort are known as consensual encounters.

"During a consensual encounter, 'officers may permissibly ask questions, such as why the subject is at that location, and may make requests for identification and permission to inspect luggage.'" *United States v. Compton*, 830 F.3d 55, 65 (2d Cir. 2016) (quoting *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996)). Consensual encounters do not require any suspicion of wrongdoing, as they are not considered "seizures" for Fourth Amendment purposes. *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992); *see also Drayton*, 536 U.S. at 201 ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions. . . provided they do not induce cooperation by coercive means." (citing *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991)).

On the other hand, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement *through means intentionally applied*." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis in original) (internal citations and quotations omitted). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id.*

Unlike a consensual encounter, a seizure must be justified by some level of suspicion to pass constitutional muster. *See Glover*, 957 F.2d at 1008. The level of suspicion that the Fourth Amendment requires depends on the nature of the intrusion. *Id.* To make a formal arrest, the police must have probable cause. *See id.* But where a police officer lacks probable cause to arrest, the officer may nevertheless "conduct a brief investigatory detention (commonly known as a '*Terry* stop') as long as the officer has reasonable suspicion 'that the person to be detained is committing or has committed a criminal offense.'" *Compton*, 830 F.3d at 61 (quoting *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014)).

**1. Whether Defendant was Seized in the Tractor Supply Parking Lot**

Against that backdrop, defendant argues that, from the moment the border patrol agents approached the sedan, he and the other occupants were seized without reasonable suspicion. Def.'s Mem. at 7–10. In opposition, the Government argues that the encounter "was entirely consensual until [S]BPA Lorenzo developed reasonable suspicion to detain the [sedan] and its occupants following the back seat passengers' admissions about their illegal immigration status." Gov't Opp. at 6–16, 19. Notably, at oral argument the Government conceded that the agents lacked reasonable suspicion to detain the sedan and its occupants until the backseat passengers admitted that they were unlawfully present in the United States.

A lawful seizure may start out as a consensual encounter initiated without any suspicion of wrongdoing. *See Compton*, 830 F.3d at 65. The Supreme Court has delineated two standards for determining whether and when a consensual encounter has become a seizure. *Brendlin*, 551 U.S. at 255. In most cases, the test is whether, "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). But in situations where "a person 'has

no desire to leave' for reasons unrelated to the police presence," the proper inquiry is "whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin*, 551 U.S. at 255 (quoting *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991)).

The Government contends that the latter test is a better fit, because there is no indication in the available record that defendant intended to exit the sedan in the Tractor Supply parking lot. Gov't Opp. at 13–14. In fairness, defendant has indicated that he and the other men voluntarily returned to the sedan after exiting Tractor Supply without making a purchase. *See* Dkt. No. 16-9 ¶¶ 1–2. But at the same time, defendant also stated that he and the others were about to depart the Tractor Supply parking lot in the sedan when the agents approached. *See* Dkt. No. 16-9 ¶ 2 ("When we were about to leave. . . [o]fficers surrounded the car"). Taking both considerations into account, the Court will consider whether a reasonable person in defendant's position would have felt free to leave, decline the agents' requests for information, or otherwise terminate the encounter.

Defendant contends that a reasonable person would not have felt free to terminate the encounter with border patrol agents in the Tractor Supply parking lot because the agents blocked all exits of the vehicle. Dkt. No. 16-1 at 7–8. In opposition, the Government maintains that the agents' positioning did not escalate the consensual encounter into a seizure because defendant and the other men voluntarily confined themselves in the vehicle, and the agents did not block the vehicle from backing out of the parking spot. Dkt. No. 19 at 10–16.

The Supreme Court has identified "certain factors which may indicate that a seizure has occurred." *United States v. Thompson*, 941 F.2d 66, 70 (2d Cir. 1991) (citing *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)). The relevant factors include: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of

the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

Applying those factors, the Supreme Court has determined that "a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Brendlin*, 551 U.S. at 255 (quoting *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)). A vehicle's passengers are likewise seized during a traffic stop because, as the Supreme Court has explained:

> An officer who orders [a] car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into . . . wrongdoing. If the likely wrongdoing is not the driving, the passenger will reasonably feel subject to suspicion owing to close association; but even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place.

*Brendlin*, 551 U.S. at 257.

But not all police interactions with stopped vehicles amount to "seizures" under the Fourth Amendment. For example, the Supreme Court has consistently held that law enforcement officers may board a stopped bus and question its passengers without implicating the Fourth Amendment's protections, "so long as the officers do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 437. In *Drayton*, the Supreme Court held that a bus encounter initiated by plainclothes police officers was consensual where:

> The officers gave the passengers no reason to believe that they were required to answer the officers' questions. When [one officer] approached respondents, he did not brandish a weapon or make any intimidating movements. He left the aisle free so that respondents could exit. He spoke to passengers one by one and in a polite, quiet voice. Nothing he said would suggest to a reasonable person that he or she was barred from leaving the bus or otherwise terminating the encounter.

*Drayton*, 536 U.S. at 203–04. The Court further noted that, "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Id.* at 204; *see also United States v. Madison*, 936 F.2d 90, 93–94 (2d Cir. 1991) (finding no seizure where detective boarded bus, obtained consent from the passenger to ask questions, and questioned the passenger while sitting in the seat behind him).

As the Government points out, some aspects of the border patrol agents' interaction with defendant resembled a bus encounter, rather than a traffic stop. First off, the agents did not direct the sedan to stop or pull over—they approached the sedan while it was already parked. *See* Dkt. No. 16-5 at 1; Dkt. No. 16-4 at 1. And unlike a traffic stop, the agents did not park directly behind the vehicle. Dkt. No. 16-4 at 1. Additionally, none of the agents wore uniforms or arrived in marked police cars, though SBPA Lorenzo did identify himself as a border patrol agent by displaying his badge. Dkt. No. 16-4 at 1. Lastly, the available record does not suggest that SBPA Lorenzo used a commanding tone when questioning the vehicles' occupants. Dkt. No. 16-5 at 1–2; Dkt. No. 19-1 at 2.

Still, other aspects of the encounter between the agents and defendant more closely resembled a traffic stop. For one, the agents surrounded the sedan and physically blocked all exits except for the rear passenger-side door. Dkt. No. 16-4 at 1. And although the agents did not park their vehicles behind the sedan, as police often do when conducting a vehicle stop, SBPA Lorenzo parked directly to the left of the sedan, leaving it boxed in on three sides and only able to reverse. Dkt. No. 16-5 at 2; Dkt. No. 16-4 at 1. Finally, BPA Hutchings admits that he issued multiple commands to defendant to stop moving and to place the lunchbox on the floor, and that he continued to issue commands until defendant complied. Dkt. No. 19-1 at 2.

In light of these competing considerations, the encounter at issue cannot be fairly categorized as either a bus encounter or a traffic stop. And even if the interaction were capable of easy classification, the Supreme Court has cautioned that there is no "litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop." *Florida v. Royer*, 460 U.S. 491, 506 (1983). Indeed, "[e]ven in the discrete categor[ies]" of bus encounter and traffic stop, "there will be endless variations in the facts and circumstances, so much variation that it is unlikely that . . . courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question [of] whether there has been an unreasonable . . . seizure in violation of the Fourth Amendment." *Id.* at 506–07.

Ultimately, "the totality of the circumstances must control," *Drayton*, 536 U.S. at 207, and a court must find that "[a] seizure . . . [has] occur[red] when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626, 629, (2003) (quoting *Bostick*, 501 U.S. at 437) (internal quotation omitted).

Based on the undisputed facts in the available record, the circumstances surrounding the encounter were as follows: Defendant was the front seat passenger in a vehicle that was about to leave Tractor Supply when SBPA Lorenzo, a plainclothes border patrol agent, parked his unmarked patrol vehicle immediately next to the sedan. Dkt. No. 16-9 ¶¶ 1–2; Dkt. No. 16-5 at 1; Dkt. No. 16-4 at 1. SBPA Lorenzo exited his vehicle, knocked on the driver's window, and identified himself as a border patrol agent by displaying his badge. Dkt. No. 16-5 at 1. Around the same time, two additional plainclothes agents approached the vehicle. Dkt. No. 16-4 at 1. BPA

Hutchings positioned himself immediately outside the front passenger-side door, while BPA Wright stood by the rear driver's side door. *Id.*

Then, starting with the driver, SBPA Lorenzo began questioning the occupants of the vehicle. Dkt. No. 19-1 at 2. During this time, BPA Hutchings observed defendant reaching toward the floor to pick up his lunchbox and place it on his lap. *Id.* BPA Hutchings also observed defendant's left hand near "the pocket area" of his pants. *Id.* BPA Hutchings ordered defendant to stop and to place his lunchbox on the floor multiple times. *Id.* According to BPA Hutchings, he issued the command until defendant complied. *Id.*

Considering the totality of the circumstances, the border patrol agents' conduct would have indicated to a reasonable person that they were not free to leave, ignore the agents, or otherwise terminate the encounter. As an initial matter, defendant could not have exited the sedan without striking BPA Hutchings—who by that point had been identified as a federal immigration officer—with a car door. *See* Dkt. No. 16-4 at 1 (noting that BPA Hutchings stood "outside the front passenger door").

Additionally, though the driver of the sedan theoretically could have terminated the encounter by reversing the sedan out of its parking spot, a reasonable person would not likely have felt free to reverse out of a parking spot with three law enforcement officers standing in the narrow space between the vehicle and the two adjacently parked vehicles. *See id.* (explaining the positioning of the sedan and the agents).

Finally, even if defendant initially felt free to ignore the agents or decline their requests for information, BPA Hutchings' repeated commands to defendant to stop and to set his lunchbox down would have communicated to a reasonable person that they were not free to disobey or otherwise ignore the agents. Dkt. No. 19-1 at 2.

In sum, a reasonable person in defendant's position would not have felt free to terminate the encounter with the agents in the Tractor Supply parking lot. Consequently, defendant was "seized" for Fourth Amendment purposes.

**2. Whether the Border Patrol Agents had Reasonable Suspicion to Seize Defendant**

As explained *supra*, even a brief seizure must be justified by at least reasonable suspicion, and the Government has conceded that the agents lacked reasonable suspicion to stop the men until the backseat passengers made admissions in response to SBPA Lorenzo's questioning.[4]

Even putting aside the Government's concession, the Court likewise finds scant record evidence of reasonable suspicion prior to the backseat passengers' admissions. The record reflects that the agents were conducting undercover surveillance in response to "multiple reports" that farms in Oneida, New York, employed workers who lacked legal status. Dkt. No. 16-3 at 1. The reports in question have not been produced, and there is no indication in the available record that the reports came from a known or verified source, or that they contain any particularized or meaningful information about the workers' identities, their countries of origin, their appearance, their residences, their work schedules, or their employers' identities. *See* Def.'s Mem. at 2.

Armed only with general allegations that unidentified persons without legal status were working on unknown farms somewhere in a 22-square mile city,[5] SBPA Lorenzo observed a group of men speaking Spanish with South American accents in the local Walmart and decided to surveil them for around two hours. *See* Dkt. No. 16-5. During that time, the agents developed no new information tending to suggest that the men lacked legal status. *Id.* Nevertheless, the agents

[4] "[I]n our Circuit, parties are 'bound by concessions made by their counsel at oral argument.'" *Soukaneh v. Andrzejewski*, 112 F.4th 107, 118 (2d Cir. 2024) (finding police officer bound by his attorney's concession at oral argument that probable cause was required for the officer to remove a suspect from an already-stopped vehicle that the officer had approached for questioning (quoting *Dorce v. City of New York*, 2 F.4th 82, 102 (2d Cir. 2021)).

[5] *Oneida city, New York – Census Bureau Profile*, United States Census Bureau, https://data.census.gov/profile/Oneida_city,_New_York?g=160XX00US3654837.

decided to follow the men to a second store, wait for them to re-enter their vehicle, and surround the vehicle while SBPA Lorenzo questioned them about their immigration status. *Id.*; *see also* Dkt. No. 16-4.

To be sure, border patrol agents are authorized to conduct inland operations or "roving patrols" to investigate immigration-related offenses. *United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005). And during a roving patrol, "[i]f 'an officer's observations lead him reasonably to suspect that a particular vehicle may contain [noncitizens] who are illegally in the country,' the officer may, consistent with the Fourth Amendment, briefly detain and question the vehicle's occupants regarding their citizenship, immigration status, and any suspicious circumstances." *Id.* (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–82 (1975)).

But an immigration officer's discretion to initiate a stop is not without limits. In that regard, the Supreme Court has explicitly held that "the apparent Mexican ancestry" of a vehicle's occupants, without more, "would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country." *Brignoni-Ponce*, 422 U.S. at 885–86. The Second Circuit has similarly held that "stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment." *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018); *see also United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.'" (quoting *United States v. Swindle*, 407 F.3d 562, 569–70 (2d Cir. 2005)); *see also Gallegos v. Haggerty*, 689 F. Supp. 93, 102 (N.D.N.Y. 1988) ("Hispanic appearance, although a relevant factor, without more, does not furnish reasonable grounds to suspect alienage, let alone illegal alienage.").

In all, the undisputed factual record confirms that the border patrol agents' stop of defendant and the other men was based on little more than their apparent South American ancestry.[6] That is not enough to give rise to reasonable suspicion. And this was not a consensual encounter. Accordingly, the border patrol agents violated defendant's Fourth Amendment right to be free from suspicionless seizures when they surrounded the sedan and began questioning its occupants without reasonable suspicion that any of the men were unlawfully present in the United States.

In light of this finding, the Court need not reach the issue of whether SBPA Lorenzo's questioning also violated defendant's Fifth Amendment rights.

**B. Remedy**

Defendant argues that his pre-arrest statements, fingerprint records, and A-file should be suppressed as fruits of the border patrol agents' unlawful seizure.[7] Def.'s Mem. at 10–12. The Government, having taken the position that the parking lot encounter was consensual, did not meaningfully respond to defendant's argument in its papers. *See generally*, Gov't Opp. But at oral argument, the Government argued that, if the Court found that the agents' conduct violated the Fourth Amendment, suppression would not be the appropriate remedy.

The Court is inclined to agree with defendant on this point. But given the Government's representations at oral argument, the Court directs the parties to submit supplemental briefing concerning an appropriate remedy in light of the Court's rulings.

---

[6] SBPA Lorenzo purportedly also considered the fact that, based on his experience, persons without lawful status will frequently shop together after work shifts or on weekends "due to economic reasons." Dkt. No. 16-5 at 1. But there is no telling how many individuals with legal status shop together due to those same economic concerns. Additionally, the men were observed shopping together in the mid-morning hours on a weekday. Dkt. No. 16-3. Absent any indication SBPA Lorenzo had experience or knowledge of farm work shifts in the region or that the men appeared to have just finished working on a farm, there is no fact-based reason to assume or infer that the men were coming from a shift at that time.

[7] For the reasons explained *supra*, *see* Point IV n.3, defendant's post-arrest statements will be suppressed as obtained in violation of his Fifth Amendment rights.

## V. CONCLUSION

Therefore, it is

**ORDERED** that

1. Defendant's motion to suppress (Dkt. No. 16) is **GRANTED**, in part;
    a. Statements made by defendant to border patrol agents at the border patrol station after he invoked his right to counsel (Dkt. No. 16-7) will be **SUPPRESSED**; and
2. Within 21 days of the entry of this Order, the parties are directed to submit supplemental briefing on the appropriate remedy as to the remaining evidentiary material (Dkt. Nos. 16-3, 16-5, 16-8).

The Clerk of the Court is directed to:

a. set a deadline accordingly.

**IT IS SO ORDERED.**

Dated: September 3, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge